# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 21, 2012

## STATE OF TENNESSEE v. L. B. RITTENBERRY, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-A-646      Mark J. Fishburn, Judge**

---

**No. M2011-00857-CCA-R3-CD - Filed July 26, 2012**

---

A Davidson County Criminal Court Jury convicted the appellant, L. B. Rittenberry, Jr., of second degree murder, and the trial court sentenced him to twenty years to be served at one hundred percent. On appeal, the appellant contends that (1) the evidence is insufficient to support the conviction; (2) the trial court should have granted his motion to suppress his statements; (3) the trial court erred by allowing the State to refer to the deceased as "the victim"; and (4) his sentence is excessive. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and ROGER A. PAGE, JJ., joined.

Jeffrey A. DeVasher and Jason Gichner (on appeal) and Laura J. Getz and Laura C. Dykes (at trial), Nashville, Tennessee, for the appellant, L. B. Rittenberry, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Robert Elliott McGuire and Joel Crim, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that in November 2008, the Davidson County Grand Jury indicted the appellant for the first degree premeditated murder of Charles Kurt Steele. At trial, Erin Dutton testified that she was the custodian of records for the Emergency Communications

Center, which received 911 telephone calls. At 6:08 p.m. on November 23, 2008, the Center received a call from the appellant.

The State played the audio-recorded call for the jury. During the call, the appellant said, "I think I've killed a man over here. He busted into my apartment. . . . He busted in my front door, . . . and he come at me." The 911 operator asked if the appellant knew the victim, and the appellant said, "He's a homeless person. . . . I think he tried to rob me." The operator asked the appellant how he killed the victim, and the appellant answered, "Ah, pretty much beat him in the head with a baseball bat." The appellant said he was scared and did not know what else to do. The appellant told the operator that he was sitting outside his apartment, that blood was splattered everywhere in his apartment, and that he did not want to go back inside. The operator asked if the appellant would check on the victim. The appellant said that he could open his door and look but that the victim "ain't moved in thirty minutes because I didn't know what to do." The appellant reiterated that the victim broke into his apartment and that he defended himself. The operator asked the appellant what happened, and the appellant said that the victim came to his apartment earlier and asked to borrow money but that the appellant would not give him any. While the appellant was cooking supper, the victim "busted open" the apartment door. The appellant told the operator that the victim "took a bunch of pills and stuff I think" and that the victim "come at me with a knife." The appellant stated that "I had to beat him to get him off of me" and that "I just started wailing on him." The appellant went to his neighbor's house for help, but no one would help him. The operator offered to give the appellant instructions for CPR, but the appellant told her the victim was dead. The appellant said he could not go back inside his apartment because "there's just piles of goo, blood everywhere." At the conclusion of the call, the appellant said, "I'm freaking out on what's happening." He informed the operator that the police had arrived and stated, "Let me roll me a cigarette. They ain't going to let me have one."

Officer Joshua Hill of the Metropolitan Nashville Police Department (MNPD) testified that he responded to the appellant's call, went to the appellant's apartment on South Gallatin Pike, and saw the appellant sitting in front of the apartment. Officer Hill said the appellant waved to him and "went back to rolling his cigarette." Officer Hill said the appellant told him, "I think I killed a man." The officer asked the appellant what he used to kill the victim, and the appellant said, "A bat." Officer Hill stated that the appellant was calm and soft-spoken and that the appellant said the victim's name was "Chucky." Officer Hill opened the appellant's front door, stepped inside the apartment, and saw the victim lying on the floor near the front door. The victim was face-down with his arms around his head. A lot of blood was on the floor, and a large knife was in the victim's right hand. Officer Hill arrested the appellant and placed him in the back of a patrol car. Medics from the Nashville Fire Department arrived and declared the victim dead.

Officer Hill testified that it was dark outside and that he did not see any blood or injuries on the appellant. While the appellant was in the patrol car, he complained of back or shoulder pain and told Officer Hill that he had been hit by a car a few years earlier. Officer Hill said that a dog and numerous cats were in the apartment and that officers "ushered" them outside. The appellant became very upset and began yelling from the patrol car. Officer Hill said he went to the car and asked the appellant "what the problem was." The appellant told the officer that he was afraid his pets would run away. Officer Hill informed the appellant that the officers needed to protect the scene. Officer Hill said appellant stated that "he didn't give a [sh**] about [the victim], that his animals were all that he had."

On cross-examination, Officer Hill testified that based upon his conversation with the appellant, he thought the appellant was intoxicated. He noticed damage to the appellant's front door but did not examine the damage. Officer Hill acknowledged that he prepared a two-page report and that he did not include in the report any information about the damaged door or the appellant's statement about his not giving a sh** about the victim.

Sergeant Robert Nielsen of the MNPD testified that he went to the appellant's apartment on November 23, 2008, and that two or three patrol units were present. Sergeant Nielsen went into the apartment and saw the victim lying on the floor in the living room. Just beyond the living room was the kitchen. The apartment's back door was in the kitchen. The back door was unlocked, so Sergeant Nielsen locked it in order to secure the scene.

William Seay, a pharmacist and the Pharmacy Manager for the Kmart Pharmacy on Long Hollow Pike in Goodlettsville, testified that on November 20, 2008, the victim filled two prescriptions. One prescription was for a thirty-day, ninety-pill supply of Lortab, also known as hydrocodone, and the other prescription was for a thirty-day, ninety-pill supply of Xanax, also known as Alprazolam.

On cross-examination, Seay testified that Xanax taken in high doses could cause confusion and hallucinations. He acknowledged that Xanax also could cause muscle twitching and "worsening mental mood" and that Lortab could cause confusion and unusual thoughts. He said that taking marijuana with the two drugs could have an "additive effect" and that taking antidepressants with Xanax could increase sedation.

Officer Tim Matthews of the MNPD testified that he went to the appellant's apartment about 6:00 a.m. on November 24, 2008, and assisted Officer Johnny Lawrence with the collection of evidence. The apartment consisted of a living room, a bedroom, a kitchen, and a bathroom. In the living room, the officers found an open medicine bottle and a lid on the floor beside a chair. Another medicine bottle was in a trash can in the living room. A chair had been turned over, and blood splatter was on a wall and on the living room furniture.

Blood splatter was on the bedroom door, and a recently-cut pork loin was in the kitchen. A large butcher knife was in the victim's right hand, and the officers collected other knives from the kitchen. Officer Matthews collected blood samples from the walls and ceiling and an aluminum baseball bat from just inside the front door. Blood was on the bat.

On cross-examination, Officer Matthews testified that the deadbolt lock on the front door was damaged. He said that the door frame was cracked and that "the catch on the frame was askew a little bit." The medicine bottle on the floor was for hydrocodone prescribed to the victim on November 20, 2008, and the bottle was broken. The medicine bottle in the trash can was for cough medicine. Officers dusted both bottles for fingerprints. On redirect examination, Officer Matthews acknowledged that he did not collect the evidence until about twelve hours after the appellant's call to 911. He said that the delay was due to the police department's waiting for a search warrant to be issued. The apartment was secured during the delay.

Officer Johnny Lawrence of the MNPD testified that four beer cans were on a small table in the living room and that the contents of an ashtray were on the floor. The victim was lying on the floor, and blood splatter was on a wall.

Williams Townes testified that at the time of trial, he had worked for Smith Brothers Carwash, near the appellant's apartment, for about seven years. In November 2008, Townes was dating Jennifer Griggs, who lived in an apartment very close to the appellant's apartment. Townes was at Griggs' apartment almost every day and spoke to the appellant occasionally. The victim was Townes' good friend, and Townes had known him for about ten years. Townes said that the victim lived with him one time for two or three months but that the victim "never stayed in one place very too long." Townes stated that the victim was a peaceful man, that the victim "wouldn't raise his hand to a fly," and that Townes never heard the victim raise his voice. The victim took prescription medication, and Townes saw him take too much medication on several occasions. Townes said that taking too much medication caused the victim to "pass out" but never made him agitated or violent. Around the time of the victim's death, Townes saw the victim go in and out of the appellant's apartment for three or four days. The victim would enter the appellant's apartment without knocking on the door.

On cross-examination, Townes denied that he was caught stealing money from Smith Brothers Carwash. He also denied that the victim sold drugs at the carwash or out of motel rooms. However, Townes acknowledged that the victim stayed in different motels. The victim had more than one prescription for pills and sold the pills in order to survive and have a place to stay.

Dr. Laura Boos of the Serology/DNA Unit in the Tennessee Bureau of Investigation (TBI) testified as an expert in serology. The TBI tested beer cans from the appellant's apartment for DNA. Some of the cans had the appellant's DNA on them, and some of the cans had the victim's DNA. The blood on the bat belonged to the victim.

Detective Danny Satterfield of the MNPD testified that he arrived at the appellant's apartment between 7:00 and 8:00 p.m. on November 23, 2008. The appellant was sitting in a patrol car. Detective Satterfield asked the appellant to step out of the car and informed the appellant that he was there to determine what happened. The appellant told the detective that the victim came into his apartment and that he beat the victim with a baseball bat. Detective Satterfield did not notice any blood on the victim's clothes. The appellant's apartment was preserved until a search warrant could be obtained, and the appellant was transported to the police department. The appellant complained of foot pain, and Detective Satterfield decided that he should be transported to the hospital. Prior to taking the appellant to the hospital, Detective Satterfield and some other officers were standing around the patrol car and discussing what appeared to be blood on the appellant's boots. The appellant was sitting in the backseat of the car. Detective Satterfield said that the appellant overheard their conversation and that the appellant said that "he did not kick anybody he had beaten [the victim] with the baseball bat and was glad that he did." An officer took the appellant to the hospital. Detective Satterfield said that after the appellant was released, he was taken to night court, "booked," and charged by the commissioner. The detective stated that while the commissioner was advising the appellant of the murder charge via video, the appellant said "something to the effect of, [he] didn't want to do it, but [the victim] got what he deserved." Detective Satterfield acknowledged that on January 29, 2009, he interviewed Jamie Freeman, who was incarcerated in Davidson County. Freeman gave the detective information about the appellant's case that had not been released to the media.

On cross-examination, Detective Satterfield testified that when he talked with the appellant on November 23, 2008, he thought the appellant had been drinking alcohol. At the appellant's preliminary hearing, Detective Satterfield testified that, in his opinion, the appellant was intoxicated on the night of November 23.

Jamie Freemen testified that at the time of the appellant's trial, he was on supervised probation for a felony criminal simulation conviction. Freemen also had two or three additional felony convictions. On December 23, 2008, Freeman violated the terms of his probation by being arrested for driving under the influence (DUI) and was put in jail. The appellant was his cellmate and told Freeman the following: The appellant and the victim had spent some time together in jail. The victim claimed he could get pills and offered to "hook up" the appellant with the victim's doctor so that the appellant could get pills and sell them. However, the deal fell through, and the appellant and the victim began arguing. On the night

of November 23, 2008, the appellant was cooking pork loin and drinking beer. At some point, he received a message that the victim was upset with him.

Freeman testified that the victim came to the appellant's apartment. The appellant never told Freeman that the victim forced his way into the apartment or that the victim tried to rob the appellant. Freeman said the appellant demonstrated how he "walked over to the wall by the door," "reached over to the wall by the door and [picked] up the bat," and "[came] around like this and [hit] the guy." The appellant told Freeman that he hit the victim for eight to ten seconds and that he ran to a neighbor's house for help. The appellant could not get any help, so he ran back to his apartment, tripped over his coffee table and telephone cord, and called 911. The appellant told Freeman that he hit the victim "in the head in the same spot knowing that nobody would know that because he had worked at a slaughterhouse slaughtering cows." Freeman said the appellant thought he "put a knife in the wrong place." Freeman wrote down what the appellant told him and hid his notes under his bunk mattress because he was hoping to "cut a deal" with the State. Later, Freeman realized his information would be important to the victim's family.

On cross-examination, Freeman acknowledged that he was eighteen years old when he was convicted of his first crime of dishonesty, receiving stolen property. He also acknowledged that he had more than ten prior felony convictions. At the time of the appellant's trial, Freeman was employed by Falcon Trucking. Initially, he claimed that he was truthful with the company about his prior convictions. However, when defense counsel confronted him with his employment application, Freeman acknowledged that he lied on the application by stating that he did not have any prior felony convictions and that he had not been involved in any traffic accidents. Freeman also lied about his criminal history on additional employment applications. He acknowledged that by talking with Detective Satterfield, he was hoping to get "some assistance" with his DUI charge because he probably would lose his job if convicted of DUI.

Kevin Carroll, an investigator for the Davidson County Sheriff's Office, testified that he was familiar with the Office's computerized Jail Management System, which kept records of inmates. According to the records, the appellant and Jamie Freeman were housed in the same jail cell from December 23, 2008, to December 31, 2008.

Becky Matlock, the custodian of records for the Tennessee Department of Labor and Workforce Development, testified that unemployment records showed the appellant began receiving weekly unemployment payments in April 2008. In order to receive the payments, the appellant had to certify over the telephone each week that he qualified for an unemployment check. The appellant continued to receive the payments and certified by telephone on November 25, 2008, that he qualified for an unemployment payment. On cross-

examination, Matlock acknowledged that the telephone certification system was automated, meaning that a collect telephone call from jail could not be accepted.

Dr. Feng Li, the Senior Associate Medical Examiner for Davidson County, testified as an expert in forensic pathology that he performed the victim's autopsy. The victim had multiple blunt force injuries on his head. Specifically, the victim had five lacerations on the back of his head caused by blows powerful enough to split the skin. The victim also had contusions on his head, including one on his forehead with a cloth or carpet imprint on it. Dr. Li stated that the imprint was consistent with the victim's having been hit on the head while he was lying face-down on the carpet. Additional injuries to the victim's head included abrasions, internal skin bleeding, internal brain hemorrhages, and bruising to the brain. The victim's skull was broken into multiple pieces, and the fractures were caused by tremendous blunt force. The victim had a contusion on his tongue, likely caused by the victim's biting his tongue. The numerous injuries caused the victim to die very quickly. However, blood was in his lungs, meaning he lived long enough to breathe blood into them. The victim had a superficial cut between his right thumb and forefinger that was made from a sharp object such as a knife. The victim's blood alcohol level was 108 milligrams per decimal liter, which was above the legal limit for driving a vehicle. Xanax, also known as Alprazolam; desmethyldiazepam, a product of Valium; THC, a product or marijuana; and antidepressants also were in the victim's system. The cause of the victim's death was blunt force injuries, and the manner of death was homicide. At the conclusion of Dr. Li's testimony, the State rested its case-in-chief.

The parties stipulated that Nancy and Chris Brewer would have testified as follows: They lived in the same apartment building as the appellant. In the week preceding the victim's death, they saw the appellant and the victim drinking beer with nearby carwash workers. On the night of November 23, 2008, the appellant knocked on the Brewers' door. Mrs. Brewer answered the door, and the appellant told her, "I think I just killed a guy, you better call the law, somebody had just burst in my door." Mrs. Brewer told him to go away because she thought he was intoxicated. She looked out the window and saw the appellant walk to his patio. The appellant sat on his patio until the police arrived.

Dr. Felix Adetunji, a psychiatrist at Middle Tennessee Mental Health Institute (MTMHI), testified for the appellant as an expert in psychiatry. Dr. Adetunji was the victim's attending physician on three occasions: September 28, October 7, and November 13, 2008. On all three occasions, the victim was admitted to MTMHI on an emergency basis for a drug overdose. The victim's drug overdose on November 13 was his second overdose that week. The victim was an alcoholic and abused prescription medication. On one occasion, the victim was described as confused and agitated. On cross-examination, Dr. Adetunji acknowledged that he never saw the victim exhibit violent behavior.

The appellant testified that in November 2008, he was living alone in an apartment on Gallatin Road. He was unemployed but had worked as a roofer and house framer. His unemployment payments were about to stop, and he was planning to look for a job. In April 2008, a man named Kenny, who worked at the nearby carwash, introduced the victim to the appellant. The victim said his name was "Chucky." Kenny told the appellant that the victim was known for selling pills in the neighborhood and that the victim sold pills to William Townes and Jennifer Griggs. The appellant stated that he did not see the victim again until July 2008. Between July and November 2008, the victim stopped by the appellant's apartment once or twice. The appellant said the victim "seemed a little weird sometimes."

The appellant testified that on the morning of Saturday, November 22, 2008, the victim came to his apartment, and they ate breakfast. He said he and the victim "hung around" the apartment, drank beer, and watched football. That afternoon, they cooked hotdogs and hamburgers on the grill and talked. The appellant said that the victim "bragged about taking pills" and that the victim said he had "OD'd like months before." The victim did not reveal that he had been released from MTMHI just days earlier. While the appellant was drinking beer, he saw the victim ingest pills. The appellant told the victim that he did not allow pills in his house and told the victim not to take any more. About 9:00 p.m., the appellant made the victim leave because the appellant did not allow anyone to spend the night in his apartment.

The appellant testified that the next morning, he woke about 10:00 a.m. and fixed breakfast. The victim arrived about 10:30 a.m., and the appellant fixed breakfast for him. The appellant went to the store and bought beer, and he and the victim watched football. The appellant caught the victim ingesting pills twice. The second time, the appellant told the victim that if he saw the victim take pills again, the victim would have to leave. The victim promised not to take any more pills. The victim had a small bag of clothes with him, and the appellant allowed him take a shower. The appellant said that after the victim got out of the shower, the victim was "acting kind of weird" and "jerking." The appellant went into the kitchen. When he returned to the living room, he saw the victim with an open pill bottle and saw him taking pills. The appellant told the victim to leave. The victim begged to stay, but the appellant said no. The victim asked to borrow money, but the appellant said no. The victim left the apartment about 2:00 p.m.

The appellant testified that he went to the grocery store, bought a pork tenderloin, and returned to his apartment. He said that while he was in the apartment cooking, he heard "boom boom." He said that he looked out the living room window to see what was happening and that "boom the door busted . . . and here come [the victim]. He -- he just rushed in." The victim was in a rage, reached into his back pocket, and said he was going to kill the appellant. The appellant was scared and thought the victim was going to kill him.

The appellant said that the victim pulled out a knife, held the knife in his right hand, and started "swinging" it at the appellant. The appellant hit the victim's hand and felt his own hand get cut by something. He grabbed the baseball bat that he kept for protection and hit the victim on the left side of the face. The appellant said that the victim was swinging the knife at him and that he hit the victim two or three more times. The appellant did not hit the victim after the victim fell onto the floor. The appellant said the victim "would have cut me to death if I didn't get him off me."

The appellant testified that he went into the kitchen and rinsed the cut on his hand. He said that he was "freaking out," that he could not find his telephone, and that he did not know how a table and a chair in the living room got overturned. The appellant checked the victim for a pulse and nudged the victim with his foot, but the victim was dead. The appellant said that he went to his neighbors' apartment and that he told Nancy Brewer, "Hey, I need you to do me a favor. . . . I need you to call 9-1-1 or call the cops for me if you will. . . . A man just busted in my apartment and I think I've killed him." Mrs. Brewer thought he was intoxicated and told him to go back to his apartment. The appellant knocked on some other doors, but no one answered. The appellant returned to his apartment, found his telephone, and grabbed a beer and some cigarettes. He went outside, sat down, and called 911. He acknowledged that he told the 911 operator that the incident happened thirty minutes prior to his call. However, he said he estimated the time.

The appellant testified that Officer Hill arrived and that he waved to the officer. The appellant told Officer Hill that he needed some help and that "I think I've killed somebody." Officer Hill asked the appellant what he used to kill the person, and the appellant said a baseball bat. The officer asked about the location of the bat, and the appellant told him that the bat was in the apartment. The appellant and the officer went inside the apartment. The appellant picked up an overturned table and realized that he should not touch anything. A second officer arrived and stood just outside the door, and Officer Hill pulled splinters off the doorframe. The appellant said he told Officer Hill, "What are you doing? . . . You're messing with the evidence, man. . . . Are you sure you have a right to be in here[?]" He said that Officer Hill told the second officer, "Get this drunk out of here right now."

The appellant testified that a detective arrived and told Officer Hill to arrest the appellant. The appellant said he asked the detective, "You don't even want to talk to me or ask me what happened?" He said the detective told him, "I know you're drunk. . . . We're going to take and put you in the police car, we are going to take you downtown . . . , and we are going to have a talk." Officer Hill handcuffed the appellant and put him into a patrol car. The appellant saw his animals come out of the apartment and banged his head against a window to get Officer Hill's attention. He said that he complained to the officer about his animals being outside and that the officer said, "All right. We'll take care of it." The

appellant never told Officer Hill that he did not care what happened to the victim. The appellant was treated at a hospital because his foot, which he had broken in April 2008, was hurting. Then the appellant was returned to the police department. He said that as he was about to get out of the patrol car, an officer looked down, pointed to the appellant's shoe, and said, "I think that is blood splatter." The appellant said that the officer asked him, "What did you do, kick somebody to death?" The appellant said he responded, "No, I didn't kick nobody to death. . . . I beat him with a bat." The appellant said he did not tell the officer that he was glad he beat the victim.

The appellant testified that he was "booked" and "put in front of a judge." He said that the commissioner kept asking if he murdered someone and that he said, "No, sir, I didn't murder nobody. . . . A man busted into my house and I defended myself." The commissioner asked the appellant if he was guilty of murder, and the appellant said, "No, sir. I didn't mean to hurt nobody, but . . . sometimes they get what they deserve." The appellant explained, "I meant that as in people that break the law and do things, breaking into people's homes and that type of thing, sometimes bad things happen to them because they are doing the wrong thing, that is what I meant." The appellant discussed his case with some of his cellmates. However, he told them exactly what he told the jury. He said that Jamie Freeman was lying and that Freeman "turned everything I said around pretty much." He said that he did not plant the knife in the victim's hand and that he had never worked for a slaughterhouse.

On cross-examination, the appellant acknowledged that he allowed the victim into his apartment, knowing the victim abused prescription drugs. The victim was angry when he left the apartment on November 23, but the appellant was not angry. The appellant's front door was locked when the victim forced his way inside. Although the victim did not demand money from the appellant, the appellant assumed the victim was there to rob him. The appellant said that the victim was "coming at" him, that he blocked the victim, that he leaned over, and that he picked up the bat. The appellant, using the bat, demonstrated for the jury how he fought with the victim and testified about the following chain of events: The appellant hit the left side of the victim's face with the bat, and the victim stumbled. The victim began "slinging" the knife at the appellant, and the knife hit the bat two or three times, making a "ting ting" sound. The appellant hit the victim on the right side of his face, and the victim hit the bat with the knife again. The appellant said that he "kicked the chair and stuff over . . . because [the victim] was coming at me again" and that he "laid into [the victim] just as hard as [he] could." The victim fell onto the floor. The appellant denied hitting the victim while the victim was on the floor and said the time between his killing the victim and calling 911 may have been fifteen minutes. He acknowledged that he talked with Freeman about the case. He also acknowledged that he told Freeman he killed the victim with a baseball bat and that some of Freeman's testimony was true.

On redirect examination, the appellant acknowledged that marks on the bat looked like marks created by the victim's knife hitting the bat. He also acknowledged that it was possible he hit the back of the victim's head as the victim was turning away. He said, "I didn't even think, it was just a reaction."

On recross examination, the State asked the appellant why the police did not find blood on his clothes. The appellant said he had been wearing shorts when he killed the victim and that he put on a pair of pants before he left his apartment to get help. However, he did not change his shirt. The State showed the appellant some knives collected from his apartment, and the appellant acknowledged that some of them were Chef Deluxe knives. He also acknowledged that the knife in the victim's hand was a Chef Deluxe. The jury convicted the appellant of second degree murder as a lesser-included offense of first degree premeditated murder.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his conviction for second degree murder because the evidence shows that he killed the victim in self-defense. In the alternative, he asserts that the evidence shows he is guilty only of voluntary manslaughter. The State argues that the evidence is sufficient to support the appellant's second degree murder conviction. We agree with the State.

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20).

Tennessee Code Annotated section 39-11-611(b)(1) provides that

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a

-11-

defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1,10 (Tenn. 2001).

The appellant contends that the evidence shows he acted in self-defense because the proof established that he repeatedly told the 911 operator and the police that the victim burst into his apartment and that the victim attacked him with a knife. The appellant also contends that the physical proof and his statements to police, although insensitive, do not contradict his version of events.

Granted, the appellant has maintained since the night of the killing that the victim forced his way into the apartment and attacked the appellant with a knife. However, Jamie Freeman, the appellant's cellmate for eight days, testified that the appellant claimed he had been arguing with the victim about pills prior to the victim's death. On the evening of November 23, 2008, the victim came to the appellant's apartment. Freeman said the appellant demonstrated how he walked to the front door, picked up the bat, and hit the victim. Dr. Li testified that the victim was struck repeatedly with enough force to break the victim's skull into pieces, and the victim's injuries showed that the appellant continued to hit him after he was lying on the floor. The appellant never told Freeman that the victim forced his way into the apartment or that the victim tried to rob him. An open and broken hydrocodone bottle was found near the victim, supporting Freeman's claim that the victim and the appellant had been arguing about pills. Although the police found a knife in the victim's hand, the appellant told Freeman that he thought he "put a knife in the wrong place." Moreover, the brand of the knife was Chef Deluxe, the same brand as many of the knives in the appellant's kitchen. The appellant contends that Freeman was impeached with his criminal record and history of dishonesty. However, the jury, not this court, was in the best position to judge the credibility of the witnesses. This court does not second-guess factual determinations made by the jury, and it was within the jury's province to reject the appellant's theory of self-defense. The fact that the jury convicted the appellant of the lesser-included offense of second degree murder demonstrates that the jury carefully considered the evidence. Taken in the light most favorable to the State, we conclude that the evidence is sufficient to support the appellant's conviction for second degree murder.

B. Motion to Suppress

Next, the appellant contends that the trial court erred by denying his motion to suppress his statements. Specifically, the appellant is challenging his statements that he "did not kick anybody[,] he had beaten [the victim] with the baseball bat and was glad that he did" and that the victim "got what he deserved." The appellant claims that the statements were the product of custodial interrogation without Miranda warnings. He also contends that even if the statements were not the product of custodial interrogation, they were still inadmissible

because their probative value was substantially outweighed by the danger of unfair prejudice. The State argues that the trial court properly denied the motion to suppress. We agree with the State.

The appellant filed a pretrial motion to suppress, arguing that the trial court should suppress the statement he made in front of the group of officers and the statement he made to the night commissioner because he was interrogated without receiving Miranda warnings. Relying on State v. Sawyer, 156 S.W.3d 531 (Tenn. 2005), the appellant argued that the statements were not the result of express questioning but were the result of police action designed to elicit a response from him.

At the end of the first day of trial, the trial court held a jury-out hearing on the appellant's motion. During the hearing, Detective Satterfield testified that the appellant was transported from his apartment to the police department and complained about needing medical attention for a broken foot. Detective Satterfield decided that the appellant should be transported in a patrol car to the hospital. While the appellant was sitting in the backseat of the patrol car, Detective Satterfield and several other officers were standing around the car. They were looking at the appellant's boots, which appeared to have blood on them. One of the officers made a comment to the other officers about keeping the boots as evidence. Detective Satterfield stated that the appellant heard the comment and that the appellant said that "he didn't kick anybody, he beat them with a baseball bat and was glad that he did." Later, Detective Satterfield took the appellant before the night court commissioner to be charged. Detective Satterfield and the prosecutor were in the courtroom with the commissioner. The appellant was in the booking area and appeared in front of the commissioner via video monitor, but he could hear and respond to what was being said in the courtroom. Detective Satterfield said that while the commissioner was advising the appellant of the charges, the appellant stated that the victim "deserved what he got."

On cross-examination, Detective Satterfield acknowledged that he testified at the appellant's preliminary hearing. He also acknowledged that during the hearing, he testified that the appellant said in front of the commissioner that "he didn't want to hurt [the victim], but [the victim] deserved what he got." Detective Satterfield specifically remembered the appellant saying he did not want to hurt the victim. The appellant had not received Miranda warnings prior to making the statements. The trial court concluded, "I can't help that he's drunk and starts spitting stuff out that you wish he hadn't spit out, but I do not see that there has been any police activity that elicited any of these comments."

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of

fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide protection against compulsory self-incrimination. To this end, "'once warnings have been given, . . . if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point, he has shown that he intends to exercise his Fifth Amendment privilege.'" State v. Crump, 834 S.W.2d 265, 269 (Tenn. 1992) (quoting Miranda v. Arizona, 384 U.S. 436, 473-74 (1966)). Under Miranda,

> "interrogation". . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980) (footnotes omitted).

Regarding the first statement, the officers were standing around the appellant, looking at his boots, and discussing whether they should collect the boots as evidence. The conversation was between them and did not invite a response from the appellant. Moreover,

there is no indication that the officers should have known that their conversation was reasonably likely to elicit an incriminating statement from him. Therefore, we agree with the trial court that the appellant voluntarily made the statement and that it was not the product of a custodial interrogation.

Regarding the appellant's statement to the night commissioner, in Sawyer, 156 S.W.3d at 532, police officers arrested the defendant pursuant to a warrant for aggravated sexual battery. They transported him to the police department; took him into a detective's office; and seated him facing the detective, who was sitting behind a desk. Id. The detective then read the arrest warrant and the affidavit of complaint to the defendant. Id. The arrest warrant provided only that the defendant was charged with aggravated sexual battery. Id. at 532-33. The affidavit of complaint, however, detailed the facts of the crime. Id. at 533. After the detective read the affidavit of complaint, but before he read Miranda warnings to the defendant, the defendant admitted to rubbing the victim's leg but denied vaginal contact as alleged in the affidavit. Id. In determining whether the reading of the affidavit amounted to an "interrogation," our supreme court stated the following:

> Some jurisdictions have held that an officer's statement advising an accused of the specific charges is not the functional equivalent of interrogation. See e.g., Enoch v. Gramley, 70 F.3d 1490, 1499-1500 (7th Cir. 1995) (officer advised the defendant that he was charged with murder and identified the victim); People v. Celestine, 9 Cal. App. 4th 1370, 12 Cal. Rptr. 2d 179, 181 (Cal. Ct. App. 1992) (officer informed the defendant that he was under arrest for "possession of rock cocaine for sale"); United States v. Brown, 737 A.2d 1016, 1021 (D.C. 1999) (officer told the defendant that he was charged with murder and identified the victim); People v. Parker, 344 Ill. App. 3d 728, 801 N.E.2d 162, 167, 279 Ill. Dec. 870 (Ill. App. Ct. 2003) (officer read arrest warrant to the defendant); Commonwealth v. Lark, 505 Pa. 126, 477 A.2d 857, 861 (Pa. 1984) (officer advised the defendant of his rights and the charges); Gates v. Commonwealth, 30 Va. App. 352, 516 S.E.2d 731, 733 (Va. Ct. App. 1999) (officer read arrest warrant to the defendant). Had the officers in this case read only the warrant to the defendant, we would agree.

Id. at 534-35; see also State v. Randy C. White, No. W2005-01794-CCA-R9-CD, 2006 Tenn. Crim. App. LEXIS 371, at **10-11 (Jackson, May 4, 2006) (stating, "While the Defendant was informed of why he was under arrest, [Officer] Dicus made no further attempt to engage

the Defendant in a conversation or discuss the specifics of the arrest so as to prompt a response from the Defendant."); State v. Richard Frank D'Antonio, No. M2003-03052-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1152, at *40 (Nashville, Oct. 26, 2005) (stating that "defendant's statement in this case was not directly responsive to the charges and were unforeseeable results of stating the crime charged and the possible range of punishment").

Unlike the facts in Sawyer, it was the night commissioner, not a police officer, who was advising the appellant of the charge. Moreover, the appellant was in a separate room from the commissioner and the detective; he was not sitting in an interrogation-type environment in a police officer's office. Finally, nothing indicates that the facts and circumstances in this case went "beyond merely reading the arrest warrant or otherwise informing the defendant of the charge." Sawyer, 156 S.W.3d at 535. Therefore, the evidence does not preponderate against the trial court's finding that the appellant's statement was not the result of a custodial interrogation.

Regarding the appellant's claim that the statements were inadmissible under Rule 403, Tennessee Rules of Evidence, because their probative value was substantially outweighed by the danger of unfair prejudice, the appellant failed to make that argument at trial. See Tenn. R. App. P. 36(a). In any event, the appellant had been charged with intentionally killing the victim. In our view, his stating that he was glad he beat the victim and that the victim got what he deserved could be probative to his intent. Moreover, Detective Satterfield testified on cross-examination at the suppression hearing that he specifically remembered the appellant stating on the night of the crimes that he did not want to hurt the victim, reducing the prejudicial effect of the statements. Therefore, we cannot say that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

C. State's Referring to the Deceased as "the Victim"

The appellant contends that the trial court erred by allowing the prosecutor to refer to the deceased as the "victim" throughout the trial. Specifically, he argues that allowing the prosecutor to refer to the deceased as "the victim" resulted in the State's invading the province of the jury. The State argues that the trial court did not err. We agree with the State.

On the morning of the second day of trial, defense counsel made an oral motion that the trial court not allow the State to refer to the deceased as "the victim." The prosecutor argued that "you can be a victim of a natural disaster and that's not a crime. I don't know that victim denotes that fact that a crime has befallen you." Without any explanation, the trial court ruled that the prosecutor could refer to the deceased as "the victim." According to the

appellant's brief, the prosecutor and the State's witnesses subsequently referred to the deceased as "the victim" forty-nine times.

In support of his argument that the trial court erred, the appellant cites State v. Nomura, 903 P.2d 718, 721 (Haw. Ct. App. 1995), in which the Hawaii Intermediate Court of Appeals held that the trial court erred by referring to the complaining witness as "the victim" during the jury instructions because "the term 'victim' is conclusive in nature and connotes a predetermination that the person referred to had in fact been wronged." The appellant also cites Jackson v. State, 600 A.2d 21, 24 (Del. 1991), in which the Delaware Supreme Court held,

> The term "victim" is used appropriately during trial when there is no doubt that a crime was committed and simply the identity of the perpetrator is in issue. We agree with defendant that the word "victim" should not be used in a case where the commission of a crime is in dispute.

Addressing the cases cited by the appellant, the State first relies on State v. Mateo, 262 P.3d 669, ___ (Haw. Ct. App. 2011), a case more akin to the case at hand, in which the Hawaii Intermediate Court held that the trial court did not err by allowing the State to refer to the deceased as "the victim," stating,

> Mateo's reliance on State v. Nomura, 79 Hawai'i 413, 903 P.2d 718 (App. 1995), for the proposition that referring to a complaining witness as "victim" is prejudicial is misplaced. This court in Nomura based its holding on Hawaii Rules of Evidence Rule 1102, which forbids the court from commenting on the evidence. Nomura, 79 Hawai'i at 417, 903 P.2d at 722. In the instant case, the circuit court made no such comment on the evidence, but rather only the State and a witness referred to Rafol as "victim."
>
> In Nomura, this court held that the term "victim" includes a "person who is the object of a crime as the victim of a robbery is the person robbed" or "one that is acted on and . . . adversely affected by a force or agent or one that is injured." Nomura, 79 Hawai'i at 416, 903 P.2d at 721 (internal quotation marks, citations, brackets, and ellipsis in original omitted). At most, referring to Rafol as the "victim" concludes that Rafol was harmed by another, an issue that is not in dispute in this case.

-17-

The State also relies on State v. William W. Chism, II, No. 54895-6-I, 2005 Wash. App. LEXIS 3228, at **8-9 (Wash. Ct. App. Dec. 27, 2005), in which the Washington Court of Appeals stated,

> We disagree with the Delaware [court's holding in Jackson v. State]. Using the term "victim" is not the same as expressing an opinion that the defendant was guilty of a crime; the term "victim applies to anyone who suffers either as a result of ruthless design or incidentally or accidentally." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2550 (1993).

We agree with the State that the trial court did not err by allowing the prosecutor to refer to Steele as "the victim." The State's theory of the case was that the appellant did not kill Steele in self-defense, and the prosecutor's use of "the victim" reflected that party's view of the evidence. In any event, the trial court instructed the jury that facts alleged by counsel were not evidence. Ordinarily, juries are presumed to follow the instructions given by a trial court. State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). Therefore, the appellant is not entitled to relief.

## D. Excessive Sentence

Finally, the appellant contends that his sentence is excessive because the trial court misapplied an enhancement factor and should have applied two mitigating factors. The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the appellant's sentencing hearing, Karlon Steele, the victim's mother, testified that the victim's death had been devastating and "almost unbearable." The victim's grandchild was born after his death, and Mrs. Karlon expressed regret that the victim would never get to know or hold the child. After the victim's death, Mrs. Karlon was treated for depression. She said that she missed the victim's loyalty and that he was loving, compassionate, and very protective of his family. She said that the appellant's lack of remorse was intolerable and that the appellant could have gotten out of the apartment without killing the victim if the appellant had feared for his life. She asked that the trial court sentence the appellant to twenty-five years in confinement.

Charles Steele, the victim's father, testified that he had been devastated by the victim's death. He said that he lived alone and that the victim "was always at my beckon call." The victim helped Mr. Steele when Mr. Steele had an operation by cooking for him and administering his medication. Mr. Steele stated that the appellant could have disabled the victim by hitting him one time and that the appellant's hitting the victim repeatedly

-18-

warranted "putting him away forever as far as I'm concerned." Mr. Steele said that he and his wife separated after the victim's death and that the loss of the victim had had a "ripple effect" on the victim's brothers and sisters. The victim was loyal and loving and was just getting to know his son when he was killed.

Ann Toy testified for the appellant that she had known him for nine years and that she had been his friend and landlord. She said that the appellant was like a part of her family; that he was kind, loving, and gentle; and that she never saw him exhibit any violence. After Toy's husband died, the appellant checked on Toy and made sure she ate. He also did yard work for her. She said that the appellant "feels like he's my child" and that his mother died when he was a boy. She asked that the appellant not receive the maximum sentence.

The appellant testified that his mother died when he was two years old and that he had twelve brothers and sisters. After his mother's death, his father put the children in an orphanage. When the appellant was ten years old, his father remarried and took some of the children, including the appellant, out of the orphanage. Five years later, the appellant's father died of lung cancer. The appellant moved to Alaska and lived with a cousin. However, his cousin was a homosexual and made advances toward him, so he left. The appellant was in the ninth grade at the time, quit school, and began working. In 1985, he returned to Tennessee and began working as a roofer for Bagsby Roofing. In 1992, the appellant went to visit one of his sisters in California and was hit by a car while trying to cross an eight-lane road. He said that the accident "messed [him] up badly," that it took about three years for him to recover, and that he still experienced pain. The appellant said that he had "always drunk beer," and he acknowledged that he had struggled with his addiction to alcohol. He said that he was sorry the victim died but that he did not purposely kill the victim and defended himself.

On cross-examination, the appellant acknowledged that he was arrested for assault in Alaska in 1983 but said that the charge was later dismissed. He said that in 1992, he was arrested for assault in Tennessee when he and a man "argued a little bit" and the man pulled a gun on him. The appellant was released on bond and went to California, where he was hit by a car. He denied that he was intoxicated at the time of the accident but said that he had consumed two beers. The appellant returned to Tennessee and pled guilty to the assault charge in 1994. The appellant was placed on probation but could not complete probation because he was using crutches and was homeless. He denied that the victim was providing him with pills in exchange for a place to stay and said that "I ain't never sold drugs, been around drugs or nothing. I do drink." Upon being questioned by the trial court, the appellant acknowledged that he occasionally took Lortab for pain he still experience from being hit by the car.

The State introduced the appellant's presentence report into evidence. According to the report, the then forty-nine-year-old appellant was divorced and completed the eighth grade. In the report, the appellant stated that he began using alcohol when he was nine years old, tried marijuana twice when he was fourteen years old, and tried LSD twice when he was sixteen years old. The appellant reported that when he was forty years old, he began taking Lortab for pain as needed. The appellant described his mental health as "good" and his physical health as "poor," stating that he suffered from gout, diabetes, high blood pressure, pain in his legs due to metal pins, constant back pain, chronic constipation, high cholesterol, and memory loss. He also reported that his diet and drinking alcohol caused extreme perspiration. According to the report, the appellant took various medications for his ailments. The report shows that the appellant worked for Richards Framing from 2003 to 2007 and for Bagsby Roofing from 1985 to 2007.

The report shows that the appellant has been convicted of numerous crimes since 1985. Specifically, the appellant has been convicted of disorderly conduct, violating the driver's license law, larceny, public intoxication, driving on a suspended license, DUI, assault, misdemeanor theft, and criminal trespass. The report also shows that the appellant violated his probation for the 1994 assault conviction and the DUI conviction.

The trial court noted that it had considered the evidence at trial and sentencing, the presentence report, the victim impact statement, the sentencing principles outlined in Tennessee Code Annotated section 40-35-103, the nature and characteristics of the criminal conduct involved, enhancement and mitigating factors, the appellant's testimony at trial and sentencing, and the appellant's potential for rehabilitation or treatment. The trial court applied enhancement factor (1), that the "defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1). The court noted that all but one of the appellant's prior convictions were for nonviolent offenses and that most of them were alcohol-related. The court stated that it was not going to "place nearly as significant a weight on [the factor] that it might otherwise place on it." The court also noted that the appellant had violated probation twice and that "that can certainly add some weight to his criminal history." The trial court applied enhancement factor (5), that the "defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," to the appellant's sentence because "the number of blows struck to Mr. Steele were unnecessary to incapacitate him." Tenn. Code Ann. § 40-35-114(5). However, the trial court did not place significant weight on the factor because the victim may have been unconscious and, therefore, "unaware of the cruelty being perpetrated upon him." The trial court also applied enhancement factor (9), that the defendant possessed or employed a deadly weapon during the commission of the offense, and placed significant weight on the factor. See Tenn. Code Ann. § 40-35-114(9).

In mitigation, the trial court applied factor (11), that the "defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," but gave the factor little weight. Tenn. Code Ann. § 40-35-113(11). Finally, the trial court considered "the situation in which [the appellant] was raised" and his employment history. See Tenn. Code Ann. § 40-35-113(13). In consideration of the enhancement and mitigating factors and the need to avoid depreciating the seriousness of the offense, the trial court sentenced the appellant to twenty years in confinement, the midpoint in the range for a Range I, standard offender convicted of a Class A felony. See Tenn. Code Ann. § 40-35-112(a)(1). The sentence was to be served at one hundred percent.

The appellant contends that the trial court erred by applying enhancement factor (5) because the appellant's killing the victim with a baseball bat, "while unpleasant," did not amount to exceptional cruelty. The appellant also contends that the trial court should have applied mitigating factors (2), that the "defendant acted under strong provocation," and (3), that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense." Tenn. Code Ann. § 40-35-113(2), (3).

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each

felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. Moreover, they are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant asserts that the trial court misapplied enhancement factor (5) regarding the victim's being treated with exceptional cruelty. In State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001), our supreme court concluded that the exceptional cruelty factor is applicable in cases of "extensive physical abuse or torture." Before a trial court may apply enhancement factor (5), the facts of the case must support a "finding of cruelty under the statute 'over and above' what is required to sustain a conviction for [the] offense." Arnett, 49 S.W.3d at 258. In the present case, the evidence shows that the appellant beat the victim extensively on the back of his head, breaking his skull into pieces, causing him to bite his tongue, and splattering blood and "goo" throughout the living room. The fact that a carpet imprint was on the front of the victim's face demonstrates that the appellant continued to beat the victim after he fell onto the floor. The beating in this case went over and above what was required for second degree murder. Id. at 258. Therefore, the trial court properly applied enhanced factor (5).

Regarding mitigating factors (2), that the appellant acted under strong provocation, and (3), that substantial grounds exist tending to excuse or justify the criminal conduct, the trial court specifically rejected those factors, stating as follows:

The Court believes that an argument occurred; [it] believes that it legitimately could have occurred over, not drug dealing, but the use of drugs, the pills - I believe one of the pills or one of the pill bottles that were found was Lortab or something similar to that, and Mr. Rittenberry acknowledged that he was taking Lortabs for his pain medication . . . . I think they were both just drunk and got into an argument, and I think the evidence supports that Mr. Rittenberry got fed up with it and took the baseball bat and beat him. . . . I just don't think the evidence supports that there ever was a defense to be raised in this case. I do believe that the knife was put there after the fact. . . . I think it was in part a drunken argument, and there may have been an issue over him not being able to provide Mr. Rittenberry more Lortabs or whatever, but I think they just - the alcohol played a factor into it, much further than was necessary.

Based upon our de novo review, we conclude that the trial court had sufficient grounds to reject the appellant's claim that the court should apply mitigating factors (2) and (3) to his sentence. Therefore, the appellant's twenty-year sentence is not excessive.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE