[No. B054612. Second Dist. Div. Seven. Sept. 28, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
EDDIE EUGENE CELESTINE, Defendant and Appellant.

**COUNSEL**

Jonathan M. Purver, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Roy C. Preminger and Alison Braun, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WOODS (Fred), J.**—Convicted by jury of possessing rock cocaine (Health & Saf. Code, § 11350, subd. (a)) appellant admitted a Penal Code section 12022.1 allegation (on bail in another case at the time of committing the instant offense), and was placed on three years probation on various conditions including that he not associate with his co-arrestee girlfriend.

Appellant contends: (1) the trial court committed *Miranda* error and (2) the "do not associate" with your co-arrestee girlfriend probation condition is invalid.

We find no error and affirm the judgment.

## DISCUSSION

A. *Appellant contends the trial court committed Miranda error.*

Prior to the presentation of evidence, appellant moved to suppress his statements. The trial court conducted an evidentiary hearing. (Evid. Code, § 402.) Five witnesses, including appellant, testified. It was undisputed that when appellant made his statements he was in custody and had not been advised of his *Miranda* rights. The sole issue was whether his statements were volunteered or the result of questioning *or its functional equivalent.* (*Rhode Island* v. *Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682].)

The trial court determined the statements were volunteered and that there was no functional equivalent of questioning. Appellant contends this determination is in error.

"The scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported [citations]. However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained." (*People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610].) " ' "[T]he trial court's ruling on a *Miranda* [ ] issue may not be set aside by us unless it is '*palpably erroneous.*' " ' " (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 575 [247 Cal.Rptr. 729, 754 P.2d 1306].)

With this perspective (*People* v. *Boyer, supra,* 48 Cal.3d at p. 263; *People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110]) we summarize the evidentiary hearing evidence.

On January 31, 1990, about 11 a.m., when Los Angeles County Sheriffs deputies arrived at a Panorama City residence to execute a search warrant, appellant and his girlfriend (Juanita Johnson) were just leaving. Deputies blocked their path and detained them while other deputies went to the subject residence. After approximately 10 minutes, when the residence had been secured but not yet searched, appellant and his girlfriend were escorted into the residence and placed on the couch. The girlfriend stated she lived there. Appellant stated he did not live there but sometimes stayed overnight. A deputy told appellant and his girlfriend he knew they were selling drugs and if he found rock cocaine and could determine whose it was "some people will be going to jail."

After approximately 30 minutes of searching, a deputy found cocaine, money, and a gun in an upstairs bedroom. Narcotic "pay and owe" sheets were also found. During the 30-minute search no one asked appellant any questions.

Having found the cocaine and the other evidence, the deputy came downstairs and told both appellant and his girlfriend they were under arrest for possession of rock cocaine for sale. "Immediately" appellant and his girlfriend stated "they don't sell rock cocaine, it was for their personal use."

■ Appellant argues that the deputy's advisement (you are under arrest for possession of rock cocaine *for sale* was the functional equivalent of questioning, rendering his response (I don't sell rock cocaine, it was for my personal use) inadmissible under *Miranda*. Appellant is mistaken.

*Rhode Island* v. *Innis* states " 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island* v. *Innis, supra,* 446 U.S. 291, 301 [64 L.Ed.2d 297, 308]. Italics added.)

The deputy's advisement (you are under arrest for possession of rock cocaine for sale) was "words or actions normally attendant to arrest" (Pen. Code, § 841[1] and hence *expressly* outside the definition of "interrogation."

Far more is required to constitute "the functional equivalent of questioning" than merely advising a person he is under arrest for a specific offense. (*Rhode Island* v. *Innis, supra,* 446 U.S. 291 [While being driven to jail for the shotgun murder of a cab driver, defendant listened to transporting officers state "God forbid one of [the handicapped children] might find [the missing shotgun] with shells and they might hurt themselves." Defendant interrupted, indicating he wanted to show them where the shotgun was. Held: volunteered.]; *People* v. *Siripongs, supra,* 45 Cal.3d 548, 574 [Sitting next to defendant an officer "began an inventory" of defendant's wallet, including five stolen credit cards. When he came to a First Interstate Bank card defendant "spontaneously denied he had stolen the card, and claimed it

[1]The section provides:

"The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of the arrest, and the authority to make it, except when the person making the arrest has reasonable cause to believe that the person to be arrested is actually engaged in the commission of or an attempt to commit an offense, or the person to be arrested is pursued immediately after its commission, or after an escape.

"The person making the arrest must, on request of the person he is arresting, inform the latter of the offense for which he is being arrested."

had come in the mail." Held: volunteered.]; *People* v. *O'Sullivan* (1990) 217 Cal.App.3d 237, 241-244 [265 Cal.Rptr. 784] [Defendant, watching booking officer inventory her possessions, hears officer state "I believe I have something here," indicating two small bags of cocaine. Defendant responds, "Oh, oh." Held: volunteered.]; *People* v. *Dominick* (1986) 182 Cal.App.3d 1174 [227 Cal.Rptr. 884] [Officer tells defendant his coperpetrator has been arrested and falsely tells him a victim has identified his photograph as one of the persons who raped her and murdered her friend. Five minutes later defendant wants to talk to the officer and an hour later he confesses. Held: defendant initiated the confession conversation.]; *People* v. *Hayes* (1985) 169 Cal.App.3d 898, 906-909 [215 Cal.Rptr. 595] [Officer tells 16-year-old he is going to have him certified as an adult. Juvenile says "You can't do that to me" and "he hadn't killed anybody and for me to come and go with him and he would show me where the gun was." Held: volunteered.]; see also 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 2685, pp. 3229-3231, 1 Witkin, Cal. Evidence (3d ed. 1986), § 626 pp. 608-609.)

B. *Appellant contends the "do not associate" with your co-arrestee girlfriend probation condition is invalid.*

■ "The Legislature has placed in trial judges a broad discretion in the sentencing process, including the determination as to whether probation is appropriate and, if so, the conditions thereof. (Pen. Code, § 1203 et seq.) A condition of probation will not be held invalid unless it '(1) has no relationship to the crime of which the [defendant] was convicted, (2) relates to conduct which is not in itself criminal, *and* (3) requires or forbids conduct which is not reasonably related to future criminality . . . .' [Citation.] Conversely, a condition of probation which requires or forbids conduct which is not in itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality." (*People* v. *Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545]. Italics added.) In a footnote *Lent* makes clear "and," not "or," is the accurate connecting term. (*Id.* at p. 486, fn. 1.)

■ The challenged probation condition satisfies the *Lent* test. Appellant having been convicted of cocaine possession and having made admissions that he was a cocaine user, it was within the discretion of the trial court to prohibit him from associating with other admitted cocaine users and suspected cocaine sellers such as his girlfriend, Juanita Johnson. (See *People* v. *Robinson* (1988) 199 Cal.App.3d 816 [245 Cal.Rptr. 50]; *In re Peeler* (1968) 266 Cal.App.2d 483 [72 Cal.Rptr. 254].)

DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred

**JOHNSON, J.,** Concurring and Dissenting.—I concur in the affirmance of the probation condition but would not reach that issue were I in the majority, because I respectfully dissent on the *Miranda* issue.

Since the majority's sketchy and sanitized recitation of the facts fails to capture the full flavor of the events leading up to appellant's admission without benefit of *Miranda* warnings, I find it necessary to tell the full story. Although appellant's version differed somewhat from the arresting officers' and portrayed an even more intimidating environment, the following account is based on what the officers' admitted to have occurred.

With a search warrant in their possession, Deputy Sheriffs Robert Barton and Phil Morris, along with half a dozen of their colleagues, converged on an apartment house at 9053 Willis in Panorama City. As they sped up to the building a brown Datsun "Z" was just leaving the driveway. One of the squad cars blocked the driveway while the other officers jumped out of their vehicles and raced up to apartment 3, the unit the warrant authorized them to search. Shortly thereafter, Deputy Morris returned and joined the two officers who were holding the two occupants of the Datsun "Z" at gunpoint.

At first the two occupants of the car denied they resided in the unit the officers were searching. Ultimately they did admit this fact and gave their names as Juanita Johnson and Eddie Celestine. The officers then ordered Johnson and Celestine to get out of their car and handcuffed them.

The officers took Johnson and Celestine to the apartment and sat them on the living room couch. Deputy Barton told them he had information rock cocaine was being sold out of this apartment unit. He told them the officers had a search warrant for narcotics at the apartment they admitted occupying. He asked them to make it easier by showing the officers where the cocaine was hidden. He also warned them if the officers found rock cocaine there they would be charging the occupants with possession of narcotics for sale. He further told them he "knew" someone was selling drugs from this location. Both Johnson and Celestine responded to these accusations by denying any knowledge of cocaine sales.

Deputy Morris remained with Johnson and Celestine while the search resumed. Eventually the officers found two rocks of cocaine in a glass dish

on a dresser in the upstairs bedroom. Deputy Barton returned to the living room with the cocaine, put it down on a coffee table in front of Johnson and Celestine and told them they were going to be charged with possession of this cocaine *for sale.* Shortly thereafter—five seconds according to respondent, ten minutes according to appellant—Johnson and Celestine responded that there were only two rocks and they were for personal use only.

Neither before this statement nor afterwards did the officers ever give a *Miranda* warning to either Johnson or Celestine. While on their way to the station house in the police car, Johnson and Celestine again said the cocaine was for personal use.

Johnson and Celestine were charged with possession for personal use. Appellant Celestine filed a motion *in limine* to exclude the statements in which the defendants had admitted they possessed the cocaine, but did so solely "for personal use." The motion was grounded on the officers' failure to give *Miranda* warnings before any of these statements were made. After a hearing, the trial court found the officers had not created an "oppressive" atmosphere. Accordingly, the court denied the motion to exclude these statements and admitted them in evidence.

This is an unnecessarily close case. If the officers had followed appropriate procedures, they would have given appellant Celestine as well as Johnson the traditional *Miranda* warnings shortly after they handcuffed these defendants and long before the statements were made. By failing to do so, and by engaging in ongoing conversation with Johnson and Celestine, the officers inevitably created a situation where any inculpatory statement would be of dubious constitutional validity.

Before statements will be excluded as a violation of the *Miranda* rules, those statements must be the product of a (1) custodial (2) interrogation. In this case there is no serious dispute appellant Celestine was "in custody" at the time he made the disputed statements, as that term has been construed by the United States and California courts. "By *custodial* interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 444 [16 L.Ed.2d 694, 706, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Here both appellant Celestine and Johnson had been removed from their vehicle, handcuffed, and ordered upstairs to Johnson's apartment where they were forced to sit, under guard, for a half-hour. Obviously they were in custody *and* deprived of their freedom of action in *every* significant way before, during and after the time they uttered the questioned statements.

The only real issue under *Miranda* and its progeny is whether the statements were made during an interrogation or whether they instead were "volunteered."

We would have a very different issue if the statements had been blurted out immediately after the officers first took the defendants into custody. But that is not what happened in this case. Here the officers took the defendants into custody—indeed clapped them in handcuffs—then marched them up to the apartment and sat them on a couch for a half-hour or so while a full-scale search was underway all around them. During that time the officers repeatedly told them they were suspected of possessing narcotics for sale, the officers "knew" rock cocaine was being sold out of this apartment, et cetera. Moreover, the officers knew these accusations might well elicit some sort of response from the suspects because on at least one occasion Johnson and Celestine both answered by denying any knowledge of cocaine sales.

The officers also asked at least one question the affirmative answer to which would have been inadmissible under *Miranda*—in effect, asking where is the cocaine.[1] Having made an inquiry which requires a *Miranda* warning, the officers clearly had commenced an interrogation. More importantly, the officers had evidenced their clear intent to interrogate Johnson and Celestine even though the primary mode of interrogation might take the form of apparently casual banter and accusations rather than forthright questions.

At some time during the search, while Johnson and Celestine were handcuffed on the couch, Deputy Barton at least once warned them that if narcotics were found they would be charged with possession for sale. When neither the question asking Johnson and Celestine to cooperate by leading the officers to the narcotics they were seeking nor the accusation that when narcotics were found they would be charged with possession for sale brought a response, the officers continued on with their search. It was only then when the two rocks of cocaine were found in the bedroom and after Johnson and Celestine had been in handcuffs for over a half-hour that Deputy Barton threw the incriminating evidence in their faces and accused them of the greater crime of possessing those narcotics for sale.

The human inclination to speak out with a denial when accused of any crime or even lesser forms of evil conduct is so strong that Anglo-American

---

[1]This sort of inquiry is to be distinguished from a request for *consent* to search. Under ordinary circumstances, it is not necessary to give a *Miranda* warning before asking consent to search a residence or other premise. (*People* v. *Thomas* (1970) 12 Cal.App.3d 1102 [91 Cal.Rptr. 867] [*Miranda* warning not required to obtain consent to search].) It is, however, required to give a *Miranda* warning before asking someone to engage in the testimonial conduct of showing the officers where the contraband is located on the premises.

jurisprudence has built an independent exception to the hearsay rule around the failure to follow that inclination. The "admission by silence" or "adoptive admission" exception to the hearsay rule is recognized in its own section of the Evidence Code. "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) This provision only codifies an exception which traces back at least a 120 years in California law. (The "admission by silence" or "adoptive admission" hearsay exception was codified in California in 1872 as subdivision 3 of section 1870 of the Code of Civil Procedure. (Cal.Law Revision Com. com., Deering's Ann. Evid. Code (1986) § 1221, p. 367.).) Essentially this hearsay exception holds that anyone who fails to deny an accusation or to offer an exculpatory explanation under circumstances where denial is reasonably appropriate is considered to have admitted the truth of the accusation. Thus a person's silence is deemed to be the equivalent of his having uttered the substance of the declarant's accusation.

This exception is based on the psychological insight—or at least the assumption—that people accused of crimes or other evil conduct ordinarily respond to that accusation if it is untrue—or if they possess any exculpatory comment which would lessen the gravity of the accusation. "The theory underlying this [admission by silence] rule is that the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial." (*People* v. *Simmons* (1946) 28 Cal.2d 699, 712 [172 P.2d 18] [in case upholding California's adherence to rule allowing introduction of adoptive admissions from defendants even while under arrest].) See also, e.g., *People* v. *Green* (1952) 111 Cal.App.2d 794 [245 P.2d 526] [silence in face of accusatory statements admissible]; *People* v. *Peterson* (1946) 29 Cal.2d 69 [173 P.2d 111] [defendant's equivocal replies to accusatory statements made by the state police admissible as adoptive admission]; *People* v. *Mallon* (1894) 103 Cal. 513 [37 P. 512].)

This same psychological insight—so well recognized under California law—was also operating when Deputy Barton accused Johnson and Celestine of possessing this cocaine for sale. Consistent with this psychological insight we—and Deputy Barton—could reasonably anticipate that Johnson and Celestine would not sit silent but would respond to the accusation with a denial or some sort of exculpatory claim. Indeed they had already responded to Deputy Barton's earlier accusations so it could not have come as a surprise they responded to this one. If appellant Celestine had remained silent when accused of the greater crime of possession for sale that silence could have been used to impeach any defense or excuse he might later offer

at trial, including the excuse the cocaine was only possessed for personal use. (*People* v. *O'Sullivan* (1990) 217 Cal.App.3d 237 [265 Cal.Rptr. 784].) So the accusation itself put enormous pressure on Johnson and Celestine to answer immediately with anything exculpatory or partially exculpatory they might have in mind rather than remain silent.

For these reasons, this accusation *in the context in which it was made* was the substantial equivalent of a question. It was calculated to elicit an answer from the defendants just as surely as if it were a question. And, as the substantial equivalent of a question, it should have been preceded by a *Miranda* warning if the officers expected the response to be admissible.

It is, of course, irrelevant that a defendant's silence is ordinarily no longer admissible against him as an "admission by silence" largely because of the *Miranda* rule itself. (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 2684, and cases cited therein.) It is even irrelevant whether the defendant's silence in the circumstances of this case would have qualified under the "admission by silence" exception to the hearsay rule in the absence of *Miranda*. What *is* relevant is that the psychological principle which underlies the "admission by silence" exception—those with exculpatory information usually offer it up in response to an accusation—applies to convert Deputy Barton's accusation into a question, an *interrogation*. "When police officers confront an accused . . . with an accusatory statement which on its face requires an explanation, they can be seeking no other result but an oral acknowledgement of the truth of the statement by the accused or the eventual court use of his silence as an implied admission. This method of interrogation is as much an attempt to elicit incriminating statements as the 'traditional' form of interrogation." (*People* v. *Stewart* (1965) 236 Cal.App.2d 27, 32, 33 [45 Cal.Rptr. 712].)

That appellant Celestine would feel impelled to respond to this particular accusation was nearly ensured by what had happened in the previous half-hour. Celestine had been forced out of the automobile in which he was riding, handcuffed, ordered to return to the apartment and sit, under guard, while a team of officers systematically combed the apartment for evidence of crime. An officer had already told him he would be charged with the serious offense of possession for sale if they found any narcotics. Then, having found a tiny quantity of narcotics, they confronted Celestine with that contraband and accused him of a crime more serious than possession of that minor quantity of cocaine ordinarily justifies—telling him he and Johnson would be charged with "possession for sale." Under those circumstances it was only reasonable for appellant Celestine to speak out and tender any exculpatory evidence he might have. And, equally significant, it was only reasonable for Deputy Barton to anticipate some such response to his

accusation appellant Celestine was guilty of the greater crime, especially since he had answered the earlier more tentative accusation.

While no direct questions were asked, I conclude this qualifies as an "interrogation" within the meaning of *Miranda* and its progeny. Moreover, it was an interrogation which took place while appellant Celestine was "in custody" and "deprived of his freedom of action in [every] significant way." (*Miranda, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at pp. 706-707].) Accordingly, it was a "custodial interrogation" which should have been preceded by *Miranda* warnings. It is conceded no such warnings were given at any time. Consequently, the initial admission of "possession for use" at the scene of the search and all subsequent admissions of that fact while in the squad cars should have been suppressed.[2]

The majority opinion cites a number of cases in which the courts found statements to have been "volunteered" rather than being the result of "interrogation." These cases are easily distinguished, however. First, most involved statements defendants offered *after* receiving full and timely *Miranda* warnings. Thus, these statements were ones defendants volunteered without questioning at a time they had been informed and knew any statements they made could be used against them. The admissibility of what defendants intentionally or stupidly volunteer after being told the consequences and their right not to speak has nothing to do with the admissibility of statements they make without questioning but before they are informed of the consequences and their rights.

Second, none of the cases the majority cites remotely resembles the "totality of circumstances" present in the instant case as they bear on the issue of whether the officer's conduct was the "functional equivalent" of interrogation. The majority seeks to isolate the single precise statement the officer uttered which finally induced appellant to make an incriminating response and compare it with the individual statements which prompted defendants to volunteer admissions in these other cases. However, nothing in any of those other decisions supports the notion officers can clap defendants

---

[2]Moreover, I am convinced this error was prejudicial. The other evidence supporting an inference Celestine "possessed" these two rocks of cocaine for *any* purpose was quite weak. The apartment where the cocaine was found was Johnson's residence not Celestine's. The evidence was in dispute as to how often he slept there. There was little to suggest it was he rather than Johnson who used the cocaine or that they both used it. Consequently, the officers' testimony Celestine had admitted he possessed this cocaine and that he possessed it "for personal use" was the strongest evidence supporting conviction. I cannot say "beyond a reasonable doubt" Celestine would have been convicted had that powerful evidence been excluded—as it should have been—from the jury's consideration of his guilt. Accordingly, under the *Chapman* standard I would feel compelled to reverse the conviction.

in chains, then for a half-hour engage them in a mix of casual banter, accusations, and in this instance at least one incriminating question without once mentioning their *Miranda* rights, and then claim a response to one of the accusations was a "volunteered" admission. If the totality of circumstances here do not amount to the "functional equivalent" of an interrogation, it is hard to imagine what would. True, it was not a question but the ultimate announcement the officers were arresting appellant for a crime more serious than the tiny quantity of evidence they found would possibly support which finally elicited a predictable admission of a lesser crime. But that does not controvert the fact this admission was the product of a totality of circumstances which amounted to the "functional equivalent of interrogation." Indeed, in its totality this entire 30-minute period was a custodial interrogation.

To approve and thus encourage the behavior the officers exhibited in this case would seriously undercut the policies behind *Miranda* and its progeny. The holding of the majority opinion encourages officers to postpone giving *Miranda* warnings until long after defendants are placed in custody in the hope those defendants will, out of ignorance and in the course of a carefully orchestrated "conversation," volunteer incriminating statements.

The majority opinion even writes a score—or at least an approved repertoire of themes—for composing this sort of interrogatory "conversation." According to the majority, it is permissible *without giving a Miranda warning* to interject into the conversation with defendants questions about where incriminating evidence is located. It is permissible to show defendants incriminating evidence the officers have found on defendants' premises. It is permissible to accuse defendants of crimes more serious than the evidence would support and to do so more than once. And, it is permissible to do all of this after handcuffing defendants and holding them for a long time—an indefinite time as far as defendants know—in a confined space surrounded by half a dozen police officers. Just don't ask the defendant any questions—other than where the incriminating evidence is located—and somehow *Miranda* warnings are unnecessary.

In actuality, one court or another has found each of these individual techniques, by itself, to be the "functional equivalent" of interrogation. (*People* v. *Turner* (1984) 37 Cal.3d 302, 316-317 [208 Cal.Rptr. 196, 690 P.2d 669] [question concerning location of incriminating evidence is "functional equivalent" of interrogation]; *People* v. *Ferro* (1984) 63 N.Y.2d 316 [482 N.Y.S.2d 237, 472 N.E.2d 13] cert. den. 472 U.S. 1007 [86 L.Ed.2d 717, 105 S.Ct. 2700] [placing evidence in front of defendant without questioning or commenting is interrogation]; *People* v. *Winship* (1980) 78 A.D.2d

514 [432 N.Y.S.2d 6] [mentioning seriousness of crime with which defendant charged constitutes interrogation and response is inadmissible]. (See generally, Rudstein et al., Criminal Constitutional Law (1991) § 4.02[3][b], pp. 4-42 to 4-46].) If one of these is enough by itself, a fortiori in combination these several techniques create the "functional equivalent" of an interrogation requiring the officers to give *Miranda* warnings. That all of this occurred during a prolonged period where appellant was handcuffed and confined merely adds to the inevitability of this conclusion.

While one might differ with the fundamental rationale of the *Miranda* opinion and the desirability of the rule it announced, this opinion remains the law and should be enforced not avoided—nor should it be rendered meaningless through the sort of extraordinary exception the majority carves out in its opinion.