Filed 1/15/14  P. v. Young CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEVEN DARRELL YOUNG,<br><br>    Defendant and Appellant. | F064118<br><br>(Fresno Super. Ct. No. F11907311)<br><br><br>**OPINION** |

<u>THE COURT</u>*

APPEAL from a judgment of the Superior Court of Fresno County.  Mark W. Snauffer, Judge.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Before Levy, Acting P.J., Cornell, J. and Gomes, J.

## INTRODUCTION

Appellant/defendant Steven Darrell Young was tried and convicted of count I, corporal injury to a cohabitant/mother of his child, F.G. (Pen. Code,[1] § 273.5, subd. (a)), with special allegations that he personally used a deadly and dangerous weapon, a blunt object (§ 12022, subd. (b)(1)); and he personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). Defendant admitted he had one prior strike conviction (§ 667, subds. (b)-(i)), and one prior serious felony conviction (§ 667, subd. (a)). He was sentenced to an aggregate term of 16 years.

On appeal, defendant contends the court erroneously admitted the statements he made at the scene, and asserts the arresting officers obtained the statements in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 (*Miranda*). Defendant also contends the court erroneously admitted evidence of a dispute with the victim about their shared vehicle.

We affirm.

## FACTS

Defendant and his girlfriend, F.G., lived together for two years. F.G. was pregnant with defendant's child, and the baby was due in May 2011. Defendant knew about the pregnancy.

Defendant and F.G. owned a Ford Expedition, but defendant kept the single set of keys. They frequently argued about the vehicle because F.G. wanted to use it to go out with her friends and do things "that I shouldn't have been doing." She was heavily using methamphetamine at the time.

On or about May 11, 2011, before their child was born, defendant let the air out of the Ford's tires so F.G. could not drive the vehicle. F.G. managed to drive the Ford from their house to a nearby gas station to fix the tires. Defendant arrived at the gas station,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2.

and F.G. said she was going to sell the car.  While F.G. was sitting in the vehicle, defendant threw something at the front windshield and cracked the glass.  F.G. called the police and reported the incident.

F.G. testified about another argument they had regarding the Ford on a different occasion.  She demanded to take the car, and defendant refused to give her the keys.  F.G. broke the driver's side mirror, poked holes in the tires, and told defendant:  "[W]ell, if I can't have it, you can't have it either,..."[2]

**Birth of F.G.'s child**

Later in May 2011, F.G. gave birth to their child at the hospital.  F.G. did not tell defendant she had the baby because she had decided to give up the child for adoption.  Defendant did not know about the adoption plans.

After the child was born, F.G. spoke to defendant, but she did not tell him that she had given birth.  By this time, they did not have a place to live.  They stored most of their belongings in the Ford, and they stayed with different friends.  The Ford was parked outside the place where defendant was living with his friend.  The Ford's tires were still flat.

F.G. occasionally went to the friend's house to get her clothes from the vehicle.  She told defendant she was staying with other family members.  She wore large clothes so defendant could not tell that she had given birth, and she did not give him a chance to ask whether the baby had been born.

By mid June 2011, F.G. started the adoption process, and the baby was in the custody of the adoptive parents.  F.G. finally told defendant about the baby's birth and the planned adoption.  Defendant was upset.  He asked F.G. how she could have done it.  F.G. did not respond and refused to talk about the child.

---

[2] In issue II, *post*, we will address defendant's contentions that the court erroneously admitted evidence about their dispute regarding the Ford.

## THE ASSAULT INCIDENT

On June 26, 2011, F.G. and defendant spent most of the day together. Defendant and F.G. drank beer, and she smoked methamphetamine. Defendant was trying to repair the Ford. He kept asking about the baby's whereabouts, and F.G refused to talk about it. Later that night, they again argued about the Ford, and defendant refused to give her the keys.

F.G. testified that around 11:00 p.m., defendant again tried to talk to her about the baby. F.G. said they would check on the child in the morning. F.G. left and went out with friends. A short time later, F.G. returned and asked for the car keys because she wanted to tow the Ford to her daughter's house.

Defendant refused to give the keys to F.G. and told her the car was unlocked if she wanted to get something. F.G. threw defendant's possessions out of the car and into the street. The neighbors emerged and took defendant's things.

### F.G.'s 911 call

At 12:22 a.m. on June 27, 2011, F.G. called 911 and said her boyfriend "just tried to beat on me cause I tried to take the car." F.G. said "he actually hit me." She accurately identified defendant by his name, birthday, physical description, and clothing, and gave the address of her location. She said defendant was still there and knew she had called the police. As F.G. spoke to the dispatcher, she cursed at defendant. The dispatcher told her not to do that because it would make it worse. The dispatcher told F.G. to stay there until the police arrived. F.G. said she was going to call a tow truck to take her car.

### The police respond

At 12:29 a.m., Fresno Police Officers Paul Zarasua and Luis Carrillo responded to the 911 dispatch in separate patrol cars and arrived at the location from different directions.

4.

Officer Zarasua drove into the area first and saw defendant standing by the curb and under a streetlight. Defendant had something in his hand that was about three or four feet long. He swung the object at the ground two or three times. Zarasua testified defendant was "exerting a lot of force and striking either the ground or something on the ground."

Officer Zarasua testified defendant walked away from the curb, crossed the street, and threw something down. Zarasua looked toward the curb and saw a woman, later identified as F.G., lying in the street, in the same area where defendant had been swinging the object.

Officer Zarasua ordered defendant to get on the ground. Defendant did not respond and walked away. Officer Carrillo arrived at the scene about 30 seconds after Zarasua, and he approached defendant from a different direction.

Officer Zarasua testified he drew his gun and ordered defendant to the ground. Officer Carrillo also ordered defendant to get down. Defendant ignored their orders. As defendant walked away, both Zarasua and Carrillo heard defendant say: "[Y]eah, I hit her."[3] The officers grabbed defendant and placed him in handcuffs. He did not have any weapons.

Officer Carrillo took defendant to a patrol car. Officer Zarasua went back to F.G., who was still lying in the street, and tried to administer first aid. She was bleeding profusely from her head, her hands and hair were covered with blood, and there was blood on the pavement where she was lying. She was able to identify herself, but she was dazed and could not respond to Zarasua's questions.

---

[3] In issue I, *post*, we will address defendant's contentions that his statements at the scene were the product of custodial interrogation and obtained in the absence of *Miranda* advisements.

Officer Carrillo testified defendant was very angry as they walked to the patrol car. Defendant yelled and cursed, and acted as if he was going to fight. As Carrillo placed defendant in his patrol car, defendant looked toward the street, where Officer Zarasua was trying to help F.G. Carrillo testified that defendant spontaneously said: " 'Yeah, I hit that bitch, two, maybe even more times, she deserved it.' "

After he placed defendant in the patrol car, Officer Carrillo joined Officer Zarasua and tried to help F.G. Carrillo encouraged F.G. to stay awake. F.G. said: "Steve did this to me," referring to defendant. Emergency personnel arrived and transported F.G. to the hospital.

Officer Zarasua retrieved the object that defendant had been swinging and threw on the ground. It was a radiator hose. There was no blood on it.

Officer Carrillo examined the Ford Expedition, which was parked nearby. It appeared that someone had been living in the vehicle. There were clothes thrown on the street near the vehicle. The tires were flat, and the front windshield was cracked. The other windows were not damaged, and there was no evidence of broken glass around the vehicle.

Officer Carrillo returned to his patrol car to prepare a report. Defendant was still secured in the back of the car. He was angry and yelling obscenities. Carrillo did not ask any questions or say anything to him. Defendant spontaneously said: " 'Yeah, so what, I hit her a couple of times.' "

**F.G.'s statements at the hospital**

F.G. was treated at the hospital and received two staples to close the wound on the back of her head. Officer Carrillo spoke to F.G. in the emergency room and asked what happened. F.G. said she did not remember much of the incident.

Detective Matthew Paley responded to the hospital at a later time. F.G. was still in the emergency room. She was crying and upset, but responsive to his questions. Paley asked her what happened. F.G. said defendant was her ex-boyfriend, and she stayed with

6.

him because she had nowhere else to go. F.G. said they had argued about her car for a couple of weeks, and again argued about the car that night. F.G. said she was pushed against the window. F.G. said the next thing she remembered was lying on the ground, and the police and paramedics were there. F.G. did not remember being hit, but said she was afraid of defendant. F.G. never said she inflicted the injuries on herself.

Detective Paley asked F.G. why defendant would do that to her. F.G. thought the main reason was because she had their child a month earlier, that she did not put defendant on the birth certificate as the father, and she gave up the baby for adoption. F.G. said defendant was upset about the whole thing.

Detective Paley asked F.G. if she wanted to go forward with the case. F.G. said she was not sure, and she would take awhile to get back to him. F.G. refused to sign a release for her medical records.[4]

## F.G.'S TRIAL TESTIMONY

At trial, F.G. offered a different version of the incident and why she called 911 that night. F.G. testified she was angry and upset about their dispute over the Ford. As they argued about the car, she threw her head back against the vehicle. She heard a pop and believed she slammed the back of her head into one of the vehicle's windows. She did not feel pain, fall down, or lose consciousness.

F.G. testified defendant never hit her. She falsely told the 911 operator that defendant hit her because she was angry and thought the police "would come … and help me take [the] car." After she called 911, she picked up a radiator hose from the ground.

---

[4] Defendant was initially charged with count I, corporal injury to a cohabitant (§ 273.5, subd. (a)); count II, assault with a deadly weapon (§ 245, subd. (a)(1)); count III, battery with serious bodily injury (§ 243, subd. (d)); and count IV, assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)). During defendant's jury trial, the court granted the prosecution's motion to dismiss counts II, III, and IV, because they were charged as alternative counts to count I.

7.

She probably intended to hit defendant with the hose because she was angry about the car. She might have hit the Ford with the hose.

F.G. testified she walked away from the Ford and felt lightheaded. She sat on the curb and realized her head was bleeding. F.G. claimed defendant helped her by putting pressure on the back of her head to stop the bleeding.[5] She was still holding the radiator hose. Defendant tried to take it away from her. The police later arrived, but she could not remember anything else.

F.G. testified she never saw defendant swing the radiator hose. She did not remember talking to any officers or saying that defendant did something to her. F.G. did not know why she did not tell the truth that night. She was high on methamphetamine and not thinking clearly. After the case was filed against defendant, she wrote letters to the district attorney and public defender to tell them the truth—that defendant never hit her, and she hurt herself when she threw her head back into the car window.

## DISCUSSION

### I. Admission of defendant's statements

Defendant contends the court erroneously denied his motion to exclude the three statements he made at the scene of the incident. Defendant argues the statements were inadmissible because he was in custody, he was interrogated, and he was never advised of the *Miranda* warnings. As we will explain, defendant may have been in custody when he made the statements, but he was not subject to interrogation, the *Miranda* advisements were not required, and his statements were voluntary.

---

[5] Officer Zarasua testified that as F.G. continued to lay in the gutter, defendant walked away from F.G. and threw the radiator hose on the ground. He did not see defendant walk back toward F.G.'s location or try to help her.

## A. **The evidentiary hearing**

Prior to trial, defendant moved to exclude the statements he made at the scene. The court conducted an evidentiary hearing to determine the admissibility of these statements. Officers Zarasua and Carrillo were the only witnesses.

Officer Zarasua testified he responded to the domestic violence dispatch and received a description of the man who allegedly hit a woman. He arrived at the scene in his patrol car and saw defendant standing on the corner. Defendant's clothing matched the suspect's description.

Officer Zarasua testified he got out of his patrol car and saw defendant walk across the street. Zarasua started to approach defendant. Zarasua testified that Officer Carrillo also arrived, got out of his patrol car, and approached defendant. Zarasua testified he did not hear Carrillo say anything to defendant.

Officer Zarasua testified he approached defendant and told him to get on the ground. Defendant did not do so. Zarasua testified he did not tell defendant he was under arrest or say anything else to him. However, defendant said, " 'Yeah, I hit her.' " Zarasua testified that Officer Carrillo was still approaching defendant when defendant made the statement. Zarasua testified that defendant's statement was not made in response to any statements or questions from the officers. Zarasua and Carrillo took defendant into custody. Zarasua testified he did not have any further contact with defendant.

Officer Carrillo testified that when he drove up to the scene, he saw Officer Zarasua make contact with defendant. Carrillo realized defendant matched the suspect's description, and also knew that defendant had outstanding warrants. Carrillo testified he approached defendant from the front. Carrillo heard Zarasua order defendant to get on the ground and put his hands behind his back. Carrillo testified he did not initially say anything or interfere with Zarasua's commands.

9.

Officer Carrillo testified Officer Zarasua put his gun away to detain defendant. However, defendant did not comply with Zarasua's orders. Carrillo gave additional commands to defendant to get on the ground and on his knees. Carrillo testified defendant said, " 'Yeah, I hit her.' " Carrillo was not sure if defendant made the statement before or after he got on the ground. Carrillo also was not sure if defendant directed the statement at Zarasua or himself.

Officer Carrillo testified he physically detained defendant, picked him up from the ground, and took him to his patrol car. Carrillo did not ask defendant any questions. As they walked to the patrol car, however, defendant asked Carrillo what he was being arrested or detained for. Carrillo replied he was being detained for warrants.[6] Carrillo testified he did not ask defendant any questions or mention the domestic violence call.

Officer Carrillo testified he placed defendant in his patrol car and noticed Officer Zarasua was giving first aid to a woman on the ground. Defendant spontaneously said, " 'Yeah, I hit that bitch two maybe even more times. She deserved it.' " Carrillo testified he had not asked or said anything about a woman.

Officer Carrillo testified he left defendant in his patrol car and conducted his investigation. When Carrillo returned to his vehicle, he sat down and finished writing his report. He did not talk to defendant. However, defendant spontaneously said, " 'Why, yeah, so what? I hit her couple times.' "

After the testimony, defense counsel argued defendant's statements were obtained in violation of *Miranda* because the officers responded to a domestic violence call, and they focused on defendant as the suspect. Defense counsel further challenged the validity of Officer Carrillo's testimony about his response to defendant's question about being

---

[6] When Officer Carrillo testified at trial, he did not mention that he told defendant he was being arrested for outstanding warrants. The record implies the court granted defendant's pretrial motion to exclude Carrillo's reference to defendant's arrest warrants when he testified at trial.

arrested, and that he only said it was for warrants. Counsel argued it was reasonable to infer "that there was further questioning and that is why [defendant] made that statement," about hitting the woman. Counsel asserted it was not credible that defendant made an inculpatory statement "out of the blue." It was "much more credible he was told why he was arrested," the officers said something about the domestic violence call or asked him about the incident, and he made the statement about hitting the woman.

The prosecutor argued there was no evidence the officers gave false testimony or misled the court about their encounter with defendant. They never questioned defendant, and he made three spontaneous statements. Defense counsel conceded defendant's statements would be voluntary if they were actually spontaneous. However, counsel argued the prosecution failed to meet its burden of proving defendant's statements were voluntary, and it was reasonable to believe he was subject to custodial interrogation.

B. **The court's ruling**

The court held defendant's three statements were admissible, that he was not subject to custodial interrogation, and *Miranda* advisements were not required. The court held defendant was not in custody when he made his first statement to Officer Zarasua, and he was not interrogated.

The court found defendant was in custody when he was being escorted to the patrol car and made the second statement to Carrillo, but he was not subject to interrogation. The court further found defendant was not subject to interrogation when Carrillo responded to his question and said he was being arrested for warrants.

The court rejected defense counsel's arguments that the officers questioned defendant, "and to assume that that is what elicited the statement, I think that is [a] bridge too far…."

C. **Custodial interrogation and voluntariness**

The advisement of *Miranda* rights is only required when a person is subject to custodial interrogation. (*People v. Mickey* (1991) 54 Cal.3d 612, 648 (*Mickey*); *People v.*

11.

*Mosley* (1999) 73 Cal.App.4th 1081, 1088 (*Mosley*).) Custodial interrogation has two components. First, the person being questioned must be in custody. The second component is obviously interrogation. (*Mickey, supra,* at p. 648; *Mosley, supra,* at pp. 1088-1089.)

"The phrase 'custodial interrogation' is crucial. The adjective encompasses any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (*Miranda v. Arizona, supra,* 384 U.S. at p. 444 ….) The noun 'refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.' (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301,… fn. omitted.)" (*Mickey, supra,* 54 Cal.3d at p. 648; *People v. Mayfield* (1997) 14 Cal.4th 668, 732.)

For police questioning to be " 'interrogation,' " it must go beyond questions "normally attendant to arrest and custody," i.e., "the police should know [the questions] are reasonably likely to elicit an incriminating response …." (*Rhode Island v. Innis, supra,* 446 U.S. at p. 301, fns. omitted.)

"Absent 'custodial interrogation,' *Miranda* simply does not come into play. [Citations.]" (*Mickey, supra,* 54 Cal.3d at p. 648.) Neither spontaneous nor volunteered statements are the products of interrogation and are not barred by the Fifth Amendment or subject to the requirements of *Miranda.* (*Miranda, supra,* 384 U.S. at p. 478; *Rhode Island v. Innis, supra,* 446 U.S. 291, 299-300; *People v. Ray* (1996) 13 Cal.4th 313, 337*; Mickey, supra,* 54 Cal.3d at p. 648.) "[V]olunteered statements not the product of interrogation are admissible." (*People v. Edwards* (1991) 54 Cal.3d 787, 815.) Indeed, a police officer is not obligated to prevent a suspect from volunteering incriminating statements. (*Id.* at p. 816.)

As a separate and related matter, a statement is involuntary or coerced if it is "obtained by physical or psychological coercion, by promises of leniency or benefit, or

when the 'totality of circumstances' indicates the confession was not a product of the defendant's 'free and rational choice.' [Citations.]" (*People v. Cahill* (1993) 5 Cal.4th 478, 482, fn. 1.) However, a confession will not be rendered involuntary if the police make neither a threat nor a promise, "but simply [make] an accurate statement of the circumstances." (*People v. Thompson* (1990) 50 Cal.3d 134, 170.)

The prosecution has the burden of proving that a custodial interrogation did not take place. (*People v. Rucker* (1980) 26 Cal.3d 368, 386; *People v. Whitfield* (1996) 46 Cal.App.4th 947, 953.) On appeal, "we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained. [Citations.]" (*People v. Smith* (2007) 40 Cal.4th 483, 502.) We exercise our independent judgment and apply federal standards to determine whether the statements were involuntary, coerced, or obtained in violation of *Miranda.* (*People v. Massie* (1998) 19 Cal.4th 550, 576; *In re Aven S.* (1991) 1 Cal.App.4th 69, 76.)

### D. Analysis

The superior court properly admitted defendant's three spontaneous statements. Defendant was never subject to custodial interrogation at the scene of the domestic violence incident. He was taken into custody and the officers did not ask him any questions. There is no evidence the officers made any statements which were reasonably likely to elicit an incriminating response. Instead, defendant made three spontaneous and voluntary statements. Moreover, we find nothing in the record to indicate that psychological or physical coercion occurred to overcome defendant's free will and render his statements involuntary. (*People v. Memro* (1995) 11 Cal.4th 786, 827.)

#### 1. *Defendant's first statement*

Defendant's first statement – " 'Yeah, I hit her' " – was made as Officer Zarasua drew his gun and ordered him to get on the ground. The superior court found defendant

13.

was not yet in custody when he made this statement. Defendant disputes this ruling and asserts that he was in custody since Officer Zarasua drew his gun and ordered him to the ground.

A suspect is likely in custody when an officer draws a gun and places the suspect in handcuffs. (*People v. Turner* (1984) 37 Cal.3d 302, 319, overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115; *United States v. Brady* (9th Cir. 1987) 819 F.2d 884, 887; *United States v. Henley* (9th Cir. 1993) 984 F.2d 1040, 1042.) As we have explained, however, "[a]bsent 'custodial interrogation,' *Miranda* simply does not come into play. [Citations.]" (*Mickey, supra,* 54 Cal.3d at p. 648.)

Defendant contends his custodial status rendered all his subsequent statements involuntary because he was "commanded to get down at gunpoint" by more than one officer, handcuffed, and placed in a police car. Defendant asserts a reasonable person would have felt intimidated and "like they were not free to leave." Defendant argues "[t]he interrogation occurred at the scene of the alleged crime and during" his arrest, and the officers "clearly focused" on him as "the main suspect."

While defendant may have been in custody, he fails to explain what constituted the alleged "interrogation" which triggered his three statements to the officers. Even if defendant was in custody before he made his first statement, he was not subject to any type of interrogation. Officer Zarasua's orders and actions were those normally attendant to arrest and custody, and did not constitute direct questioning or statements which were reasonably likely to elicit an incriminating response. "*Miranda* does not 'prohibit the police from merely listening to ... voluntary, volunteered statements' uttered by a person, whether or not in custody, 'and using them against him at the trial'.... [Citation.]" (*Mickey, supra,* 54 Cal.3d at p. 648.)

In addition, Officer Zarasua's actions did not render defendant's spontaneous statement involuntary. Officer Carrillo testified Zarasua holstered his weapon before they took defendant into custody. There is no evidence the officers subjected defendant

14.

to coercion, " 'compelling influences,' " or " 'psychological ploys' " that would have made his statements involuntary.  (*People v. Clark* (1993) 5 Cal.4th 950, 986 (*Clark*), reversed on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

### 2. *Defendant's second statement*

Defendant made his second statement as Officer Carrillo escorted him to his patrol car, and it was triggered by his own question to Carrillo about why he was being arrested.  Carrillo knew defendant had outstanding warrants and told defendant that was the reason for his arrest.  Carrillo did not ask defendant any questions, make additional statements, or discuss the domestic violence incident.  Instead, defendant spontaneously and voluntarily said, " 'Yeah, I hit that bitch two maybe even more times.  She deserved it.' "

Defendant was in custody, but he was still not subject to interrogation.  Officer Carrillo's response to defendant's question about the reason for his arrest did not constitute direct questioning or its functional equivalent.  "Far more is required to constitute 'the functional equivalent of questioning' than merely advising a person he is under arrest for a specific offense.  [Citations.]" (*People v. Celestine* (1992) 9 Cal.App.4th 1370, 1374.)  "A police officer's response to a direct inquiry by the defendant does not constitute 'interrogation….' [Citation.]" (*United States v. Briggs* (7th Cir. 2001) 273 F.3d 737, 740.)  An officer's "mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory.  [Citations.]" (*United States v. Conley* (1st Cir. 1998) 156 F.3d 78, 83.)

For example, in *Clark, supra*, 5 Cal.4th 950, the defendant was arrested for murder.  He was advised of the *Miranda* warnings and invoked his rights.  The police drove him to the hospital to obtain a blood sample.  During the drive, the defendant asked the officers what the penalty was for murder.  (*Id.* at p. 982.)  An officer responded that he had never seen anyone serve more than seven and one-half years unless the person was a "mass murderer."  After this exchange, the defendant confessed.  (*Ibid.*)  *Clark*

15.

held that the conversation was not an interrogation. (*Id.* at pp. 985-986.) "Clearly, not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response. [Citation.]" (*Id.* at p. 985.) *Clark* concluded that the record failed to establish that the defendant was subject to " 'compelling influences, psychological ploys, or direct questioning.' [Citation.]" (*Id.* at p. 986.)

### 3. *Defendant's third statement*

Finally, defendant's third statement was also voluntary and not triggered by any statements or conduct by Officer Carrillo. Defendant was in custody in Carrillo's patrol car as the officers conducted their investigation at the scene. When Carrillo returned to his vehicle, he completed his paperwork and did not ask defendant any questions or make any statements to him. At this point, defendant spontaneously said: " 'Why, yeah, so what? I hit her couple times.' " As with his prior statements, defendant was in custody but he was not subject to direct questioning or the functional equivalent of interrogation, *Miranda* advisements were not required, and his spontaneous statement was not involuntary.

We thus conclude that even though defendant was in custody when he made his three statements, he was never subject to interrogation, *Miranda* advisements were not required, and his spontaneous statements were voluntary and properly admitted. " 'Volunteered statements of any kind are not barred by the Fifth Amendment' or subject to the prophylactic requirements of *Miranda.* [Citations.]" (*People v. Ray, supra,* 13 Cal.4th at p. 337.) "Nothing in *Miranda* is intended to prevent, impede, or discourage a guilty person, even one already confined, from freely admitting his crimes, whether the confession relates to matters for which he is already in police custody or to some other offense." (*Ibid.*)

16.

## II.     Admission of prior dispute about the vehicle

Defendant also made a pretrial motion to exclude any evidence about the dispute with F.G. regarding their Ford vehicle.  The court denied defendant's motion to exclude and held the evidence was relevant.  Defendant contends the court abused its discretion and this evidence was extremely prejudicial.

### A.  Background

The court conducted a pretrial hearing on the admissibility of the dispute between defendant and F.G. about their Ford, which occurred around May 2011, before F.G.'s child was born.  Defense counsel asserted their disagreement about the vehicle was irrelevant to the alleged domestic violence incident.  Defense counsel pointed out that while defendant flattened the Ford's tires during the prior incident, the vehicle had been repaired, and F.G. had flattened the tires during a subsequent incident, which was the reason why the vehicle could not be driven at the time of the domestic violence dispute.

The prosecutor replied the vehicle dispute was relevant to motive in this case. When F.G. called 911 on the night of the domestic violence incident, she said they were arguing about their car.  When F.G. later spoke to the detective at the hospital, she also said the domestic violence incident began when they continued to argue about the car.

The court held the evidence was admissible because the car incident was "part and parcel of this event, if it is that close in time, given the statements that apparently were made by the witness [F.G.]."[7]

### B.  Analysis

"Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of a prior criminal act against a criminal defendant 'when offered to prove his

---

[7] Neither the court nor the parties addressed the admissibility of the vehicle dispute as a prior act of domestic violence within the meaning of Evidence Code section 1109.

or her conduct on a specified occasion.' Subdivision (b) of that section, however, provides that such evidence is admissible when relevant to prove some fact in issue, such as motive, intent, knowledge, identity, or the existence of a common design or plan. [¶] 'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) The decision whether to admit other crimes evidence rests within the discretion of the trial court. (*Id*. at p. 23.)

The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity and common scheme or plan. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.) In contrast, the least degree of similarity between the uncharged act and the charged offense is required in order to prove motive and intent. (*Id*. at p. 402; *People v. Lindberg*, *supra*, 45 Cal.4th at p. 23.) The probative value of uncharged act evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus. (*People v. Daniels* (1991) 52 Cal.3d 815, 857; *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 374.) It is the existence of the acts, rather than their similarity, that gives rise to the inference of motive. (*People v. Thompson* (1980) 27 Cal.3d 303, 319, fn. 23; *People v. Pertsoni*, *supra*, 172 Cal.App.3d at p. 374.) "Evidence tending to establish prior quarrels between a defendant and [the victim] and the making of threats by the former is properly admitted and is competent to show the motive and state of mind of the defendant…." (*People v. Cartier* (1960) 54 Cal.2d 300, 311.)

Even if such evidence is relevant, it may be "excluded under Evidence Code section 352 if its probative value is 'substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.] 'Because substantial prejudice is inherent in the case

18.

of uncharged offenses, such evidence is admissible only if it has substantial probative value.' [Citation.]" (*People v. Lindberg*, *supra*, 45 Cal.4th at pp. 22-23.)

The determination whether the probative value of other crimes evidence outweighs its potential for prejudice rests within the discretion of the trial court, which will not be disturbed absent a showing that its ruling " 'falls outside the bounds of reason.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) The defendant must show "that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " (*People v. Yu* (1983) 143 Cal.App.3d 358, 377.)

The disputed issue in this case was whether defendant inflicted F.G.'s bloody head injuries and assaulted her with the radiator hose, as she initially reported to the police officers at the time of the domestic violence incident; or she caused the injury herself by alleging slamming her head into the Ford when they argued about the vehicle, as she testified at trial.

The court did not abuse its discretion when it admitted this evidence. Their ongoing, heated, simmering dispute about the Ford was integral to this case based on F.G.'s 911 call on the night of the domestic violence incident, when she told the operator that they were arguing about the vehicle. When F.G. was able to speak to the detective at the hospital, she said the primary reason for the assault was defendant's anger about giving up their child for adoption. However, F.G. also said they had been arguing about the car for a couple of weeks, they again argued about the car that night, and she was pushed against the window during their argument.

Given F.G.'s trial claim that defendant never hit her, the ongoing dispute about the vehicle was relevant and probative of defendant's motive and intent. As the superior court properly noted, the vehicle dispute, and the parties' respective flattening of the tires, had occurred within weeks and was very much part of the domestic violence incident that exploded that night. The court did not abuse its discretion when it denied defendant's relevancy objections.

## **DISPOSITION**

The judgment is affirmed.